UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

FIDEL MARQUEZ

No. 20 CR 602

Judge Mary M. Rowland

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant FIDEL MARQUEZ, and his attorneys, CHRISTOPHER NIEWOEHNER and WILLIAM R. ANDRICHIK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.     The information in this case charges defendant with conspiracy to commit bribery, in violation of Title 18, United States Code, Section 371.

3.     Defendant has read the charge against him contained in the information, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the information, which charges defendant with conspiracy to commit bribery, in violation of Title 18, United States Code, Section 371.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

Beginning no later than in or around early 2012, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant FIDEL MARQUEZ, conspired with Chief Executive Officer 1 ("CEO-1"), Lobbyist 1, Consultant 1, Individual 1, and others, to: (a) corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of Public Official A and his associates, intending that Public Official A, an agent of the State of Illinois, be influenced and rewarded in connection with the business, transactions, and series of transactions involving things of value of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(1)(B); and (b) corruptly give, offer, and agree to give things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of Public

2

Official A and his associates, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions involving things of value of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(2), all in violation to Title 18, United States Code, Section 371.

<u>Background</u>

Between the 1980s and 2019, MARQUEZ was employed in various positions with ComEd, a utility that provided electricity to industrial, commercial and residential customers in northern Illinois, including about 70% of the population of the State of Illinois. ComEd was a majority owned subsidiary of Exelon Corporation, a publicly traded for-profit corporation. The State of Illinois regulated ComEd's business activity, including the rates that ComEd charged its customers for electricity, as well as the rate of return ComEd realized from its business operations. Legislation that passed through the Illinois General Assembly and became law had the potential to impact ComEd's business activity.

In early 2012, MARQUEZ became ComEd's Senior Vice-President of Governmental and External Affairs. In that position, MARQUEZ oversaw ComEd's lobbying activity before the Illinois General Assembly (in both the House of Representatives and Senate), the Illinois Governor's Office, and various Illinois administrative agencies. ComEd's lobbying team consisted of both full-time ComEd

employees ("internal lobbyists") and third-party individuals and firms under contract to perform lobbying services for ComEd ("external lobbyists"). At times, ComEd also contracted with individuals and companies for the provision of political consulting services for ComEd. Under ComEd's internal corporate structure, such political consultants, like the internal and external lobbyists, were supposed to be under MARQUEZ's authority.

At the time MARQUEZ assumed his governmental affairs position, CEO-1 was the chief executive officer of ComEd. CEO-1 remained the chief executive officer of ComEd until on or about June 1, 2018, at which time CEO-1 became a senior executive at Exelon Utilities, which was the Exelon subsidiary with oversight of all of Exelon's utilities, including ComEd. CEO-1 remained a senior executive at Exelon Utilities until in or around October 2019.

Lobbyist 1 became ComEd's Executive Vice-President of Legislative Affairs from in or around 2009, although he served in a similar role prior to that date and continued in that job until Lobbyist 1's retirement in or around early 2012. In that position, Lobbyist 1 was responsible for ComEd's lobbying activity before the Illinois General Assembly, the Illinois Governor's Office, and various Illinois administrative agencies. Soon after Lobbyist 1's retirement from ComEd, ComEd contracted Lobbyist 1 (through a company controlled by Lobbyist 1) to serve as an external lobbyist for ComEd. Lobbyist 1 remained a contract lobbyist for ComEd until some point in 2019.

4

Consultant 1 was the owner of Company 1, which performed consulting services for ComEd until in or around 2019.

At the time MARQUEZ assumed the position of Senior Vice-President of Governmental and External Affairs, and continuing throughout the remainder of MARQUEZ's employment with ComEd, Public Official A was the Speaker of the Illinois House of Representatives. As Speaker, Public Official A had the ability, using procedural mechanisms in the House of Representatives, to prevent legislation that Public Official A opposed from moving forward. Conversely, Public Official A could also serve as a very powerful and persuasive force to move legislation forward.

At the time MARQUEZ assumed his governmental affairs position, Individual 1 was serving as an external lobbyist for ComEd. Individual 1 was a former member of the Illinois House of Representatives and a licensed Illinois attorney who, along with Individual 1's spouse, operated an entity ("Individual 1's Firm") that provided lobbying services. Based upon his discussions with Individual 1 and others, MARQUEZ knew that Individual 1 had a close personal relationship with Public Official A and, among other things, sometimes communicated on behalf of Public Official A. After Individual 1 retired from lobbying at or near the end of 2016, ComEd contracted Individual 1 to provide political consulting services to ComEd.

5

### Hiring of Public Official A's Associates as Vendor "Subcontractors"
### Who Performed Little or No Work for ComEd

MARQUEZ agreed with others, including but not limited to CEO-1, Lobbyist 1, Consultant 1, and Individual 1, to arrange for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where certain political allies and workers performed little or no work that they were purportedly hired to perform for ComEd. These acts were taken for the purpose of influencing and rewarding Public Official A in connection with his official duties as Speaker of the Illinois House of Representatives, and to assist ComEd with respect to legislation affecting ComEd and its business that had a value of over $150,000,000.

One of the ways ComEd bestowed benefits upon Public Official A's associates was by directing payments to them through third-party intermediaries. In certain instances, Public Official A's associates were characterized as "subcontractors" for the third-party intermediaries, but, in fact, the associates of Public Official A often did little or no work for ComEd or the third-party intermediaries in return for the payments they were receiving from ComEd. The ComEd payments intended for Public Official A's associates were added to any existing amount due to the third-party intermediary in return for its otherwise contracted services. The fact that third-party intermediaries were being used as conduits for payments to Public Official A's

6

associates, for the purpose of influencing and rewarding Public Official A, was not accurately presented or disclosed in the contracts and other internal company documents utilized to arrange for and authorize these payments.

One instance of such an arrangement was the provision of payments to political associates of Public Official A through Consultant 1's company, Company 1. The use of Company 1 as a third-party intermediary for ComEd payments to Public Official A's associates began prior to the time that MARQUEZ assumed his role as ComEd's Senior Vice-President of Governmental and External Affairs, and it continued into in or around 2019.

In or around 2013, MARQUEZ learned from Individual 1 that associates of Public Official A were receiving payments through Company 1. In particular, at that time, Individual 1's Firm was serving as a third-party intermediary to funnel ComEd payments to an associate of Public Official A. Individual 1 requested of ComEd that the payments to that associate of Public Official A be shifted from Individual 1's Firm to Company 1; in other words, Individual 1 asked that the associate of Public Official A be switched from being a "subcontractor" of Individual 1's Firm to being a "subcontractor" of Company 1. In conversation, Individual 1 told MARQUEZ that two other associates of Public Official A were already receiving payments from ComEd through Company 1. Individual 1 did not describe any work that the Public Official A associates were doing; rather, Individual 1 described their importance in terms of how close they were to Public Official A. MARQUEZ agreed to facilitate the shift and

took steps to effect Individual 1's request and shift the associate of Public Official A from Individual 1's Firm to Company 1.

Later, in or around 2016, MARQUEZ facilitated the movement of the "subcontract" for the same associate of Public Official A who had been paid through Individual 1's Firm and later Company 1, from Company 1 to another third-party intermediary.

In or around Spring 2018, CEO-1 told MARQUEZ that Individual 1 contacted CEO-1 and asked that another associate of Public Official A be hired by ComEd, meaning that the associate would begin to receive a stream of monthly payments from ComEd, in the same manner by which other associates of Public Official A were receiving payments from Company 1. CEO-1, Consultant 1, and MARQUEZ agreed to facilitate the payments by agreeing to amend Company 1's contract to include money intended as payment to the associate of Public Official A. As with the ComEd payments being made to other associates of Public Official A through third-party intermediaries, as MARQUEZ understood, these payments were made to influence and reward Public Official A concerning legislation affecting ComEd.

On or about July 30, 2018, MARQUEZ caused a payment of $37,500 to be sent to Company 1, a substantial portion of which was intended for associates of Public Official A.

In each calendar year from 2011 through 2019, the State of Illinois annually received in excess of $10,000 in federal benefits.

8

7.      The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.      Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

9.      Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote

9

respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2018 Guidelines Manual.

b.     **Offense Level Calculations.**

i.     Pursuant to § 2X1.1, the base offense level is determined based on the Sentencing Guidelines calculations applicable to the underlying offenses, 18 U.S.C. § 666(a)(1)(B) and (2)), which are grouped pursuant to Guideline § 3D1.2(c) and (d).

ii.     Pursuant to Guideline § 2C1.1(a)(2), the base offense level is 12.

10

   iii.  Pursuant to Guideline § 2C1.1(b)(1), a 2-level increase is appropriate because the offense involved more than one bribe.

   iv.  Pursuant to Guideline §§ 2C1.1(b)(2) and 2B1.1(b)(1)(N), a 26-level increase is appropriate, because the value of the benefit obtained in exchange for the payments exceeded $150,000,000.

   v.  Pursuant to Guideline § 2C1.1(b)(3), a 4-level increase is appropriate because the offense involved an elected public official.

   vi.  Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

   vii.  In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant

is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 41, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 324 to 405 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Pursuant to Guideline § 5G1.1(a), because the offense of conviction carries a maximum term of imprisonment of 60 months, the guidelines sentence is 60 months' imprisonment.

      e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing,

and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

   f. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Cooperation

  11. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

12.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that does not include a term of imprisonment as a component of the sentence. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

13.     If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

14.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does

not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15. Regarding restitution and fine, the parties agree that the issues of restitution and a fine will be determined at sentencing and each party will be free to present arguments for the Court's consideration on these issues. Defendant agrees that he will not take a position regarding restitution that is contrary to or inconsistent with his acceptance of responsibility or the information provided as part of his cooperation with the government.

16. Restitution shall be due immediately and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

17. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18. Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

19.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 20 CR 602.

20.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

21.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

    a.     **Right to be charged by indictment**. Defendant understands that he has a right to have the charge prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at

16

trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

      b.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

      i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

c.      At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

d.      **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the

18

government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

22.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

23.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

24.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

25.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to

the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

26.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

27.     Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service),

for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant. Nothing in this paragraph or the preceding paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

28.    Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

29.    Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

30.    Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant,

any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

31.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

32.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

33.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _September 28, 2020_

AMARJEET BHACHU   Digitally signed by AMARJEET BHACHU
Date: 2020.09.27 16:28:50 -05'00'

Signed by Amarjeet S. Bhachu
on behalf of
JOHN R. LAUSCH, JR.
United States Attorney

FIDEL MARQUEZ
Defendant

TIMOTHY CHAPMAN   Digitally signed by TIMOTHY CHAPMAN
Date: 2020.09.27 16:40:13 -05'00'

TIMOTHY J. CHAPMAN
MICHELLE KRAMER
Assistant United States Attorneys

CHRISTOPHER NIEWOEHNER
WILLIAM R. ANDRICHIK
Attorneys for Defendant

24